TFH
MSM/JAR: USAO 2023R00062

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO.** 26-cr-00353-PX |
| | * | |
| **MARC AARON POTASH** | * | **(Conspiracy to Commit Health Care Fraud, 18 U.S.C. § 1349; Health Care Fraud, 18 U.S.C. § 1347; Conducting Transactions in Criminally Derived Proceeds, 18 U.S.C. § 1957(a); Forfeiture, 18 U.S.C. § 982(a)(7), 21 U.S.C. § 853(p), 28 U.S.C. § 2461(c))** |
| **Defendant** | * | |
| | * | **UNDER SEAL** |
| | * | |

*******

USDC- GREENBELT
'26 OCT 8 PM4:27

**INDICTMENT**

**COUNT ONE**
**(Conspiracy to Commit Health Care Fraud)**

The Grand Jury for the District of Maryland charges that:

**Introduction**

At all times relevant to this Indictment:

**The Defendant and Relevant Entities**

1. Defendant **MARC AARON POTASH**, a resident of Montgomery County, Maryland, was the founder and Chief Executive Officer of Tiero, LLC ("Tiero").

2. Tiero was a Delaware limited liability company with a principal office address of 9801 Washingtonian Boulevard, Suite 200, Gaithersburg, Maryland 20878.

3. **POTASH** also was the founder of Certify Global, Inc., d/b/a Certify Health ("Certify").

4. Certify was a Delaware corporation with a principal office address of 9801

Washingtonian Boulevard, Suite 200, Gaithersburg, Maryland 20878.

5. Both Tiero and Certify were owned by URock, LLC a/k/a URock Ventures ("URock"), a venture capital firm.

6. **POTASH** was the founder and managing partner of URock.

7. Employee 1 was the billing manager and claims specialist of Tiero.

8. Provider 1 was a medical doctor who resided and maintained an office in Dearborn, Michigan, and was listed as a rendering provider on Tiero's insurance claims.

9. The Maryland Department of Health (MDH) was a Maryland state agency that oversaw public health programs and regulated health care facilities and professionals.

**Public and Private Insurers**

10. The Medicaid Program ("Medicaid") was a health care benefit program under 18 U.S.C. § 24(b). Medicaid was overseen and administered by the Centers for Medicare and Medicaid Services ("CMS"), an agency within the United States Department of Health and Human Services ("HHS"), and various state agencies. Medicaid was jointly funded by federal and state programs and was a program that provided medical insurance coverage primarily to individuals with low incomes and limited resources.

11. The Medicare Program ("Medicare") was a health care benefit program under 18 U.S.C. § 24(b). Medicare was a federally funded program administered by CMS that provided free and below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled.

12. Medicare was divided into multiple parts, including Medicare Part C, also known as the "Medicare Advantage" Program. Medicare Advantage provided Medicare beneficiaries with the option to receive their Medicare benefits through privately managed care plans,

including health maintenance organizations and preferred provider organizations.

13. Individuals who received benefits under Medicare and Medicaid were referred to as "beneficiaries" or "recipients."

14. Private health insurance companies ("Commercial Insurers") offered individual and group health insurance benefit plans pursuant to which individuals could obtain coverage for health care items and services. Each Commercial Insurer was a health care benefit program under 18 U.S.C. § 24(b). Individuals receiving benefits from Commercial Insurers were referred to as "members."

15. The Federal Employees Health Benefits Program (FEHBP) was a health care benefit program under 18 U.S.C. § 24(b). The FEHBP was a federally funded health insurance program provided by the federal government for federal employees, retirees, and their eligible spouses and dependent children. The FEHBP was overseen and administered by the Office of Personnel Management which contracts with various Commercial Insurers to provide services to FEHBP members.

**CPT Code 87426**

16. When seeking reimbursement from Commercial Insurers, the FEHBP, and Medicare and Medicaid, physicians, clinics, laboratories, and other health care providers (collectively, "providers") can submit billing for the benefit, item, or service with a description and the appropriate "procedure code," as set forth in the Current Procedural Terminology (CPT) Manual or the Healthcare Common Procedure Coding System (HCPCS). Additionally, claims submitted seeking reimbursement generally include certain important information, including: (a) the member's name and identification number; (b) a description of the health care benefit, item, or service that was provided or supplied to the member; (c) the procedure code for the benefit,

item, or service; (d) any modifiers appended to the procedure code to provide additional information about the benefit, item, or service provided; (e) the place of service code; (f) the dates upon which the benefit, item, or service was provided or supplied to the member; and (g) the name of the rendering provider, as well as the applicable identification number for the rendering provider.

17. The HCPCS was divided into two principal subsystems, referred to as Level I and Level II of the HCPCS.

18. Level I of the HCPCS was comprised of the CPT, a numeric coding system maintained by the American Medical Association (AMA). The CPT was a uniform coding system consisting of descriptive terms and codes that were used primarily to identify medical services and procedures furnished by physicians and other health care professionals. The CPT codes were published and updated annually by the AMA.

19. The 2023 AMA CPT codebook described services in Pathology and Laboratory as being provided by a physician or by technologists under responsible supervision of a physician. Pathology and Laboratory CPT code 87301 was described as follows, "Infectious agent antigen detection by immunoassay technique (eg, enzyme immunoassay [EIA], enzyme-linked immunosorbent assay [ELISA], fluorescence immunoassay [FIA], immunochemiluminometric assay [IMCA], qualitative or semiquantitative; adenovirus enteric types."

20. Pathology and Laboratory CPT code 87426 was considered a related and/or "child" code under "parent" code 87301. Pathology and Laboratory CPT code 87426 was described as follows, "severe acute respiratory syndrome coronavirus (eg, SARS-CoV, SARS-CoV-2 [COVID-19])." CMS generally reimbursed for CPT code 87426 at a rate between $35.33 and $45.23 per test.

**CLIA Certification**

21. The Clinical Laboratory Improvement Amendments (CLIA) under the CMS regulated all laboratory testing performed on humans in the United States to ensure quality laboratory testing. All medical laboratories, including laboratories in physician offices, were required to have a CLIA certification in order to receive payments from Commercial Insurers, the FEHBP, and Medicare and Medicaid. One of the levels of CLIA certification is the certificate of waiver, which is also known as a CLIA waiver.

22. The 2023 American Medical CPT codebook described "modifiers" as a means to report or indicate that a service or procedure that had been performed had been altered by some specific circumstance but not changed in its definition or code. Modifiers also enabled health care professionals to effectively respond to payment policy requirements established by other entities.

23. The 2023 American Association of Professional Coders (AAPC) HCPCS Level II codebook described modifier "QW" as a CLIA-waived test.

**The Conspiracy and Scheme to Defraud**

24. Between at least in or about January 2022 and in or about May 2026, in the District of Maryland and elsewhere, the defendant,

**MARC AARON POTASH,**

knowingly and willfully combined, conspired, confederated, and agreed with others known and unknown to the Grand Jury, to commit health care fraud, that is, to execute a scheme and artifice to defraud a health care benefit program, namely Medicare, Medicaid, the FEHBP, and insurance plans offered by the Commercial Insurers, and to obtain, by means of false and fraudulent pretenses, representations, and promises, money, and property owned and under the custody and

control of the Commercial Insurers, the FEHBP, and Medicare and Medicaid (the "scheme to defraud") in connection with the delivery of and payment for health care benefits, items, and services, in violation of 18 U.S.C. § 1347.

**The Purpose of the Conspiracy**

25. It was the purpose of the conspiracy that **POTASH** and his coconspirators sought to maximize the financial success of Tiero and personally enrich **POTASH** by obtaining money through false and fraudulent representations to Commercial Insurers, the FEHBP, and Medicare and Medicaid.

**Manner and Means of the Conspiracy and Scheme to Defraud**

26. It was part of the conspiracy and scheme to defraud that:

a. **POTASH**, Employee 1, and their coconspirators sent false emails, letters, and paperwork to the MDH to obtain a CLIA certification for Tiero based on the false representation that providers at Tiero performed on-site COVID-19 testing on beneficiaries and members at Tiero's purported lab.

b. Beginning in or around January 2022, **POTASH**, Employee 1, and their coconspirators caused Tiero to apply for, obtain, and renew a CLIA certification from the MDH because, in **POTASH**'s words, Tiero's business model was "All about the CLIA."

c. On or about January 28, 2022, **POTASH** sent a false email to an MDH representative, claiming that Tiero was "looking for a clia waiver for [over-the-counter] tests conducted in the office," but on that same day, **POTASH** texted the following to Individual 1:

> We need the clia only for in office testing
> It doesn't matter how we get it
> They will grant it for that
> Don't discuss test distribution with Maryland
> It's irrelevant
> They don't grant a waiver for that and [the Commercial Insurer] won't

take it without a clia waiver
Let's just get it for in office tests

d. On or about January 31, 2022, **POTASH** sent a false email to an MDH representative, claiming that Tiero was applying for a CLIA certification for "on-site [point-of-care] testing being conducted by [Individual 1]" and that Tiero's CLIA application "ha[d] nothing to do with our [over-the-counter] tests," but, in reality, **POTASH**, Employee 1, and his coconspirators applied for, obtained, and renewed Tiero's CLIA certification in order to submit false and fraudulent claims for in-office COVID-19 testing and analysis at Tiero's purported lab rather than for over-the-counter, self-administered COVID-19 tests shipped to insured individuals.

e. On or about February 4, 2022, **POTASH** signed and sent a false letter to the MDH, claiming that Tiero was requesting "a CLIA waiver to perform [point-of-care] tests in our office" in Maryland even though **POTASH**, Employee 1, and his coconspirators were merely shipping over-the-counter, self-administered COVID-19 tests to beneficiaries and members nationwide.

f. On or about May 23, 2022, after being alerted that CPT Code 87426 was not the correct procedure code for distributing over-the-counter, self-administered COVID-19 tests, **POTASH** texted Individual 1, "I'm going to be sending you a another email with a bunch of push back on your email to me. . . You should discuss this with me before sending an email like that."

g. On or about June 22, 2022, **POTASH** sent a false email to an MDH representative, stating, "Yes, we do test on site," even though to date no COVID-19 tests had been administered or analyzed at Tiero's purported lab.

h. In or around July 2022, **POTASH**, Employee 1, their coconspirators, and

Tiero employees prepared for and participated in an MDH on-site audit of Tiero's purported lab, and falsely and fraudulently represented that Tiero did in-office COVID-19 testing and analysis at Tiero's purported lab.

i. In or about September 2022, in an effort to recruit Individual 2 as Tiero's purported lab director, **POTASH** texted Individual 2, "You will have to [do] zero . . . Zero work. . . . We won't be doing any tests. . . it's just to keep the clia . . . . I will never, ever, ever ever put you at risk. . . . We will not be doing any on-site tests[.] But we are ready to do them [t]o maintain the clia [a]lthough we won't be performing any actual tests."

j. Although Tiero was "not . . . doing any on-site tests," **POTASH**, Employee 1, and their coconspirators created and made available for MDH an alleged Tiero laboratory protocol handbook that made false representations, among other things, about patient testing procedures, lab personnel instructions, and protocols for specimen kit management.

k. **POTASH**, Employee 1, and their coconspirators caused the submission of false and fraudulent claims to Commercial Insurers, the FEHBP, and Medicare and Medicaid using CPT Code 87426 and modifier QW, which falsely and fraudulently represented (i) dates of service; (ii) place of service; and (iii) the rendering provider for COVID-19 tests.

l. **POTASH**, Employee 1, and their coconspirators caused the submission of false and fraudulent health insurance claims that listed a place of service code used for an Office visit, but in reality, involved Tiero merely shipping over-the-counter, self-administered COVID-19 tests to beneficiaries and members across the country.

m. **POTASH**, Employee 1, and their coconspirators caused the submission of false and fraudulent health insurance claims that used CPT Code 87426 and modifier QW when the COVID-19 tests were not administered by a provider at Tiero nor were they analyzed at

Tiero's purported lab.

n. **POTASH**, Employee 1, and their coconspirators caused the submission of false and fraudulent claims to Commercial Insurers, the FEHBP, and Medicare and Medicaid for testing services provided by individuals who did not, in fact, provide such services at Tiero.

o. **POTASH**, Employee 1, and their coconspirators caused the submission of false and fraudulent claims to Commercial Insurers, the FEHBP, and Medicare and Medicaid for testing services on days when Tiero provided no services to the insured individuals.

p. **POTASH**, Employee 1, and their coconspirators caused the submission of false and fraudulent claims to Commercial Insurers, the FEHBP, and Medicare and Medicaid for insurance beneficiaries and members who had never visited the Tiero office.

q. **POTASH**, Employee 1, and their coconspirators employed a billing practice of shipping over-the-counter, self-administered COVID-19 tests to insured individuals only after submitting claims to and receiving reimbursement payments from Commercial Insurers, the FEHBP, and Medicare and Medicaid.

r. On or about September 16, 2022, **POTASH** received an email from Employee 1 which stated that "we are registered as a providers office, billing through a physician under the CPT code : 87426 . . . even though we are not directly involved with the patient we are billing as such."

s. On or about November 22, 2022, in response to Provider 1 receiving complaints from insured individuals, **POTASH** received an email from Employee 1 which stated, "As volume increases patients and insurance companies have been reaching out to [Provider 1] increasingly stating they do not remember rendering service/did not render service. Is [Provider 1] aware of our full process? . . . [I]t seems like [Provider 1] is under the impression

we provide testing services prior to billing. I can reach out and explain, please let me know if you would prefer to speak with him."

t. When Tiero's false and fraudulent claims for testing services under CPT Code 87426 and modifier QW were rejected by Commercial Insurers, the FEHBP, and Medicare and Medicaid, **POTASH**, Employee 1, and their coconspirators caused the submission of bills to the pharmacy benefit plans of insured individuals.

u. **POTASH**, Employee 1, and their coconspirators concealed and attempted to conceal the existence of the conspiracy and their fraudulent statements and claims. For example, **POTASH**, Employee 1, and their coconspirators caused the submission of fraudulent insurance claims with false dates of services, often across three separate dates per month to circumvent an insurer's daily system edit. As another example, in response to audits from Commercial Insurers, **POTASH**, Employee 1, and their coconspirators created fraudulent invoices with false dates of services.

v. On or about July 19, 2024, **POTASH** discussed with a Certify employee increasing Tiero's insurance coverage for "criminal litigation."

w. On or about August 21, 2025, **POTASH** texted a group of individuals on WhatsApp that he was "almost thrown in jail for insurance fraud."

x. **POTASH**, Employee 1, their coconspirators, and Tiero and its employees caused the submission of more than $100 million in false and fraudulent health care claims to Commercial Insurers, the FEHBP, and Medicare and Medicaid, resulting in more than $50 million in insurance payments to Tiero.

18 U.S.C. § 1349

**COUNTS TWO THROUGH EIGHT**
**(Health Care Fraud)**

The Grand Jury for the District of Maryland further charges that:

1. Paragraphs 1 through 26 of Count One of this Indictment are incorporated here.

2. On or about the dates set forth as to each count below, in the District of Maryland, the defendant,

**MARC AARON POTASH,**

submitted and caused the submission of the following false and fraudulent claims under CPT code 87426 and Place of Service 11 (Office) to Commercial Insurers and the FEHBP that were not provided as represented and ineligible for reimbursement, each submission constituting a separate count:

| Count | Member | Alleged Service Date | Approximate Submission Date | Claim No. | Units Billed | Amount Billed |
|---|---|---|---|---|---|---|
| 2 | D.S. | 8/29/2022 | 8/30/2022 | 22421B5221P | 8 | $272 |
| 3 | M.Z. | 11/2/2022 | 11/5/2022 | EMAC2G5FR00 | 3 | $102 |
| 4 | B.S. | 11/29/2022 | 11/30/2022 | D33418866000 | 8 | $272 |
| 5 | K.D. | 12/1/2022 | 1/6/2023 | DR0609043001 | 3 | $102 |
| 6 | F.P. | 1/2/2023 | 1/9/2023 | 30091C5274P | 8 | $272 |
| 7 | B.K. | 1/3/2023 | 1/11/2023 | EPY13MBL800 | 3 | $102 |
| 8 | J.K. | 2/2/2023 | 2/3/2023 | E03418992800 | 8 | $272 |

18 U.S.C. § 1347
18 U.S.C. § 2

**COUNTS NINE THROUGH THIRTEEN**
**(Conducting Transactions in Criminally Derived Proceeds)**

The Grand Jury for the District of Maryland further charges that:

1. Paragraphs 1 through 9 of Count One of this Indictment are incorporated here.

2. Car Dealership 1 was a car dealership located in Alexandria, Virginia.

3. Car Dealership 2 was a car dealership located in Bethesda, Maryland.

4. **POTASH** was the sole member of Trippy Goat Farm LLC.

5. Real Estate Company 1 was a company located in Bethesda, Maryland, that provided real estate settlement, title, and escrow services.

6. On or about the dates set forth below, in the District of Maryland and elsewhere, the defendant,

**MARC AARON POTASH,**

did knowingly engage and attempt to engage in monetary transactions by, through, or to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, a health care fraud conspiracy and health care fraud, in violation of 18 U.S.C. §§ 1347, 1349.

| Count | Approximate Date | Event |
|---|---|---|
| **9** | 12/5/2022 | A wire transfer of approximately $118,294.55 from a First National Bank account ending in x1986, in the name of Tiero LLC, to Car Dealership 1 to purchase a Range Rover vehicle |
| **10** | 6/20/2023 | A wire transfer of approximately $4,131,131.69 from the Capital One account ending in x8609, in the name of Trippy Goat Farm LLC, to Real Estate Company 1 to purchase real property in Beallsville, Maryland |
| **11** | 7/24/2023 | A wire transfer of approximately $100,218.64 from the Capital One account ending in x0304, in the name of URock LLC, to Car Dealership 2 to purchase a Mercedes-Benz vehicle |
| **12** | 1/8/2024 – 1/10/2024 | Security transfers totaling approximately $4,258,659.65 from the Morgan Stanley Investment Account ending in x1640 to Morgan Stanley Investment Account ending in x1642 |

| | | |
|---|---|---|
| **13** | 1/8/2024 – 1/10/2024 | Security transfers totaling approximately $8,966,318.61 from the Morgan Stanley Investment Account ending in x1641 to Morgan Stanley Investment Account ending in x1643 |

18 U.S.C. § 1957(a)
18 U.S.C. § 2

## FORFEITURE ALLEGATION

The Grand Jury for the District of Maryland further finds that:

1. Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. § 982, 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c), in the event of the defendant's conviction on any of the offenses charged in this Indictment.

### Health Care Fraud Forfeiture

2. Pursuant to 18 U.S.C. § 982(a)(7), upon a conviction of any of the offenses set forth in Counts One through Eight of this Indictment, the defendant, **MARC AARON POTASH**, shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

### Money Laundering Forfeiture

3. Pursuant to 18 U.S.C. § 982(a)(1), upon a conviction of the offenses set forth in Counts Nine through Thirteen of this Indictment, the defendant, **MARC AARON POTASH**, shall forfeit to the United States any property, real or personal, involved in the offense, or any property traceable to such property.

### Property Subject to Forfeiture

4. The property to be forfeited includes, but is not limited to, the following:

   a. 2023 Land Rover Range Rover P400 SE SWB SUV, VIN: SALKP9FU5PA027677;

   b. 2024 Mercedes-Benz GLE53C4, VIN: 4JGFD6BB7RB020632;

   c. The real property purchased by Trippy Goat Farm LLC, located at 20311 Beallsville Road, Beallsville, Maryland 20839;

d. All funds in Morgan Stanley Investment Account x144983, approximately $20,402,572.10, as of July 31, 2026.

**Substitute Assets**

5. If any of the property described above, as a result of any act or omission of the defendants:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property that cannot be subdivided without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c).

18 U.S.C. § 982
21 U.S.C. § 853(p)
28 U.S.C. § 2461(c)

Kelly O. Hayes/MSM

Kelly O. Hayes
United States Attorney

A TRUE BILL:

SIGNATURE REDACTED

Foreperson

10/8/26

Date